John H. Scott, SBN 72578
Lizabeth N. de Vries, SBN 227215
**SCOTT LAW FIRM**
1388 Sutter Street, Suite 715
San Francisco, California 94109
Telephone: (415) 561-9601
Facsimile:  (415) 561-9609
john@scottlawfirm.net
liza@scottlawfirm.net

Izaak D. Schwaiger, SBN 267888
527 Mendocino Avenue Ste. B
Santa Rosa, CA 95401
Tel. (707) 595-4414
Facsimile: (707) 851-1983
E-mail: izaak@izaakschwaiger.com

Attorneys for the Plaintiffs

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JESUS LOPEZ, MICHAEL ROBERTS, JESSE BRUCKLACHER, and RIGOBERTO CABRERA<br><br>Plaintiffs,<br><br>v.<br><br>COUNTY OF SONOMA, STEVE FREITAS, MAZEN AWAD, MICHAEL MERCHEN, DAVID HOUSE, BRIAN GALLAWAY, JOSEPH MEDEIROS, ADAM GORDON, DEPUTY FLORES, BOGDEN PANEK, KYLE SMITH, CRAIG PETERSON, JOSEPH GALANTE, DAVID COOPER, MATHIAS WILLIAMS, JOSEPH NOUGUIER, and DOES 1-50, inclusive.<br><br>Defendants. | Case No.<br><br>**COMPLAINT FOR DAMAGES [UNDER 42 U.S.C. § 1983]**<br><br>*JURY TRIAL demand* |

COMES NOW PLAINTIFFS, Jesus Lopez, Michael Roberts, Jesse Brucklacher, and Rigoberto Cabrera who complain of defendants, and each of them, and alleges as follows:

**JURISDICTION & VENUE**

1. This action is brought pursuant to 42 U.S.C. §§ 1983 and the Fourth, Eighth and Fourteenth Amendments to the United States Constitution. Jurisdiction is based upon 28 U.S.C. §§ 1331 and 1343.

2. The claims alleged herein arose in the County of Sonoma in the State of California. Venue for this action lies in the United States District Court for the Northern District of California under 28 U.S.C. §1391(b)(2).

**PARTIES**

3. Plaintiffs JESUS LOPEZ, MICHAEL ROBERTS, JESSE BRUCKLACHER, and RIGOBERTO CABRERA (hereinafter "plaintiffs") are residents of Sonoma County, California.

4. Defendant COUNTY OF SONOMA is a public entity situated in the State of California and organized under the laws of the State of California.

5. At all relevant times, defendant STEVE FREITAS was the Sheriff and an elected official of the COUNTY OF SONOMA. Plaintiffs allege on information and belief that Sheriff Freitas is legally and ethically responsible for supervising and managing the jails in Sonoma County, and in that capacity is responsible for protecting the health and safety of both inmates and jail staff. Sheriff Freitas and his sworn staff, while acting under color of law, have taken an oath to uphold the Constitution of the United States. This includes the obligation to protect the constitutional rights of inmates, including the right to be free from excessive force and cruel and unusual punishment.

6. Defendants MAZEN AWAD, MICHAEL MERCHEN, DAVID HOUSE, BRIAN GALLAWAY, JOSEPH MEDEIROS, ADAM GORDON, DEPUTY FLORES, BOGDEN PANEK, KYLE SMITH, CRAIG PETERSON, JOSEPH GALANTE, DAVID COOPER, MATHIAS WILLIAMS, and JOSEPH NOUGUIER were employed by the County of Sonoma. At all times mentioned they worked for the Sheriff's Office and acted within the course and scope of their employment. Said defendants directly participated in some of the events alleged herein.

7. Defendants AWAD, MERCHEN, and HOUSE were acting in their supervisory capacities as Lieutenants. Defendant GALLAWAY was acting in his supervisory capacity as a Sergeant. Said Defendants directly supervised, directed and participated in the events herein. They acted according to an official policy and practice known as "yard counseling" and/or "behavior counseling" approved by Sheriff Freitas. Their acts and omissions, and those of the other Defendants named herein, were officially reviewed and approved by the Sheriff's Office as being within policy.

8. Defendants MEDEIROS, GORDON, FLORES, and PANEK were directly involved in the initial "yard counseling" of Plaintiff LOPEZ under the direction and supervision of Defendant HOUSE.

9. Defendants SMITH, PETERSON, GORDON and GALANTE were directly involved in the initial "yard counseling" of Plaintiff BRUCKLACHER under the direction and supervision of Defendants GALLAWAY and HOUSE.

10. Defendants MEDEIROS, COOPER, WILLIAMS and NOUGUIER were directly involved as members of the SERT team, under the supervision of Defendants MERCHEN and/or AWAD, with subsequent "counseling" sessions of Plaintiffs CABRERA, LOPEZ and BRUCKLACHER.

11. As to Plaintiff ROBERTS it is not known at this time which members of the SERT team were directly involved in his "yard counseling," however, Plaintiff believes said officers were acting under the direction and supervision of Defendants MERCHEN and/or AWAD.

12. The true names and capacities, whether individual, corporate, associate or otherwise, of defendants Does 1 through 50 inclusive, are unknown to the plaintiffs, who therefore sue said defendants by such fictitious names. Defendants DOES 1 through 50, and each of them, were responsible in some manner for the injuries and damages alleged herein. Plaintiffs are informed and believe and thereupon allege upon information and belief that each of them is responsible, in some manner, for the injuries and damages alleged herein.

13. In doing the acts and/or omissions alleged herein, the defendants, including DOES 1 through 50, acted in concert and/or conspired with each of said other defendants herein.

14. At all times during the incident, the defendants acted under color of state law in the course and scope of their duties as agents and employees of the County of Sonoma.

15. Defendants' conduct was authorized, encouraged, condoned and ratified by the County of Sonoma.

**STATEMENT OF FACTS**

16. On May 28th, 2015 at approximately 10:30 a.m., Sonoma County Correctional Deputy Panek was performing "soap call" in the Male Special Module of the Sonoma County Main Adult Detention Facility. During Soap Call inmates receive various forms, shower soap, and supplies from a deputy. Inmates may miss soap call for various reasons, including sleeping. In such a case, the sleeping inmate receives no supplies.

17. Upon arriving at the cell of Giovanni Montes, Deputy Panek knocked and called out to the inmate. Montes, who was sleeping and on heavy medication, did not respond. The deputy repeated his attempts to awaken Montes by pounding on the inmate's cell-door and scraping his keys across the cell window. The noise of the disturbance alerted other inmates who witnessed these following events.

18. Deputy Panek became verbally hostile with Montes, and told him that he was going to lose his "OCA" or "out-of-cell" privileges for sleeping through soap call. Inmates in Male Special are given one hour of OCA every two days. It is the only time where inmates are allowed out of their cells to bathe, exchange reading material, or make phone calls. Montes became angry and exchanged words with the Deputy through his cell-door.

19. In response, Deputy Panek radioed for the assistance of additional jail staff. Sgt. Robledo, Deputy Gordon, and Deputy Smith arrived on the unit. Montes's cell was opened and the guards entered. They grabbed Montes and threw him to the ground, handcuffed him, then slammed his head into the floor, striking several rapid and violent blows about his head, shoulders, neck, and back. One deputy kicked Montes in the head. The deputies then removed Montes from the unit to administer "yard-counseling," a practice that is common in the jail and often involves the application of pain, threats, and physical violence to inmates. These events occurred in view of Jesus Lopez, an inmate then serving a sentence for misdemeanor drug

- 4 -

possession, whose cell was nearby. Horrified by Montes's treatment, Lopez screamed through the doors at the deputies that what they were doing was wrong. Other inmates joined in the protest, yelling and kicking at their doors.

20. In response to the loud protests of the inmates, including the plaintiffs, jail staff assembled to conduct "yard counselings" of all inmates in the MS and MA housing units. Lieutenants House and Awad; Sergeants Gallaway and Robledo; and Deputies Gordon, Porter, Smith, Medeiros, Esquibel, Cummesky, Dillon, Sesto, Galante, Flores, and Peterson divided into two groups. Deputies Cummesky and Sesto were assigned to video record the yard counseling.

22. The events alleged herein occurred in essentially two phases. The first phase involved the administration of "yard counseling" by the team initially assembled of on duty staff identified above. They broke up into two teams and began the process of administering "yard counseling" to each inmate on the unit. One of the first to receive the "counseling", after inmate Montes, was Plaintiff LOPEZ. A "team" including Defendants MEDEIRIOS, FLORES, GORDON, and PANEK administered the initial phase of yard counseling on LOPEZ. Soon thereafter another "team" administered yard counseling to Plaintiff BRUCKLACHER. This team included Defendants GALLAWAY, SMITH, PETERSON, GORDON and GALANTE.

21. For reasons that are not clear, a decision was made soon after the initial counseling of Plaintiff BRUCKLACHER to suspend the operation and call for the SERT team. This request was made by Defendants HOUSE and AWAD. Defendant MERCHEN, head of the SERT team, concurred. The SERT team assembled during the noon hour. Most members of the team were off-duty at the time and were now receiving overtime pay to perform additional "yard counseling" that afternoon.

22. The SERT team, under the direction of Defendants MERCHEN and AWAD, proceeded to administer "yard counseling" to every inmate (twenty plus) on the unit, including additional counseling to Plaintiffs LOPEZ and BRUCKLACHER. In the report produced to date, most of the counseling was not reported in terms of which SERT team members provided yard counseling to each inmate. For example, there is no record of which SERT team members provided counseling to Plaintiff ROBERTS. As to Plaintiffs CABRERA, LOPEZ and

- 5 -
COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

BRUCKLACHER it is reported that the same "team" of SERT members were primarily involved in their afternoon "yard counseling", i.e., Defendants MEDEIROS, COOPER, WILLIAMS and NOUGUIER.  The second counseling session of Plaintiff LOPEZ is reported to have begun at 3:00 pm.  The second counseling session of Plaintiff BRUCKLACHER is reported to have begun at 3:30 pm.

**LOPEZ**

23. Plaintiff LOPEZ was serving a sentence for drug possession at the time of this event. Before noon Deputies Medeiros, Panek, Gordon, and Flores and possibly others approached his cell. After a verbal exchange through the cell-door in which Lopez repeated his concerns regarding Montes, the deputies ordered him to turn around and place his hands behind his back. Lopez complied. They cuffed Lopez through the food tray slot, opened his door, and threw him to the floor face first. With his body prone on the concrete, deputies began grinding his face into the floor and pummeling his body, causing injury to his shoulder while yelling "stop resisting!" Deputies repeatedly called Lopez a "bitch" and told him that he was "in their house now." Lopez cried that the deputies had injured his shoulder. In response the deputies lifted Lopez by his arms causing him excruciating pain, and removed him to the "yard."

24. Once in the yard, deputies threw Lopez to the concrete face first with his hands still bound behind his back. Due to his restraints, Lopez could not break his fall and the subsequent force of the landing caused the air in his lungs to escape rapidly and painfully.  As Lopez lay stunned, restrained, and unable to breath, deputies got on his back and attempted to fold his legs towards his head. Deputies continued to yell, "stop resisting!" The physical exchange left Lopez with an injured right foot and in serious abdominal pain. Lopez repeatedly told deputies of his injuries and difficulty breathing. His screaming and complaints were met with laughter. Deputy Panek derided Lopez for his complaints, then stomped on his injured foot while returning him to a holding cell. With every medical complaint Lopez made deputies responded sarcastically, "Why? What happened to you?"

25. Later that day, at approximately 3 p.m., Deputies Medeiros, Cooper, Williams, Nouguier and possibly others approached Lopez' cell.  Lopez was ordered out of his cell. He

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

informed deputies that he could barely move due to the injury to his foot. The deputies entered the cell and removed Lopez to the yard. They threw a restrained Lopez onto the ground face first. Defendant Medeiros began grinding Lopez's face into the concrete, asking him "does the concrete feel good on your face?" and reminding Lopez that he was their "bitch," that they were "having fun" beating the inmates, and that they could "do this all day." Lopez cried in pain and requested medical attention, but his cries only met with further punishment from jail staff. Defendants Cooper, Williams and/or Nouguier began to push Lopez's legs over his back and toward his neck again as defendant Medeiros pinned his torso to the ground with a knee. Another deputy then asked Lopez if he "was going to be able to follow orders."

26. At this time Lt. Awad arrived and announced to Lopez that it would be better for him if he started following house rules. Lopez told Lt. Awad that what was happening was wrong. Lt. Awad told Lopez that he was "sick in the head" and informed him that he was going to be "taught a little lesson."

27. At the direction of Lt. Awad, defendants Medeiros, Cooper, Williams and/or Nouguier began another round of punching and kicking Lopez and smashing his face into the concrete. As the beating continued, Lt. Awad told Lopez that he was to blame for the violence. Lopez cried that they were treating him worse than an animal.

28. Lopez felt someone punch the back of his neck and other deputies began punching, kicking, and body-slamming Lopez to the point of involuntary defecation. They placed shackles around Lopez's feet and attached them through his handcuffs to a chain secured around his waist. A mask was put over his head and defendant Medeiros pushed his face into the floor.

29. The deputies dragged Lopez to the mental health unit and stripped him naked. Covered in his own feces, Lopez pleaded for toilet paper to clean himself with. The deputies ignored his pleas, laughed at him, and locked him naked in isolation covered in his own feces for two days. Lopez did not receive medical treatment during this period.

30. After two days in the mental health module, Lopez was returned to his cell. Deputies had removed all of his personal belongings, including toilet paper, his letters and photographs, and other incidentals. Lopez was left in his closed and locked cell for another four days before

being permitted to shower. In addition to his injured foot, Lopez suffered head and abdominal injuries and remained in constant pain for many weeks after the attacks. The window port on his cell door, the only view to the world outside of his tiny cell, was locked closed by Sgt. Gallaway for the next thirty days.

### MICHAEL ROBERTS

31. Michael Roberts, an inmate pending disposition of criminal charges, awoke to the sound of inmate Montes being removed from his cell. He heard screaming and watched as the deputies taser and beat the inmate until he appeared to be unconscious. Horrified by what he was witnessing, Roberts yelled out in protest as he observed what appeared to be deputies continuing to beat Montes while screaming "stop resisting" even after that inmate had lost consciousness. Roberts observed Deputy Panek repeatedly knee the fallen inmate in the face. Other inmates around Roberts, including Jesus Lopez, began to loudly protest as well. Roberts heard one deputy tell Lopez, "You're next."

32. Shortly thereafter Roberts observed several other deputies enter Lopez' cell. Roberts heard sounds of a struggle and beatings, then observed inmate Lopez being dragged handcuffed from his cell to the yard where he was subject to further physical abuse. At one point Lopez' screams of pain became so loud that Roberts became nauseous and almost threw up. Roberts started yelling for the guards to stop as he felt himself begin to spiral into a full-blown panic attack. He repeatedly pressed the emergency call button in his cell for help. Deputy Alcala responded through the speaker, "Quit pushing the fucking button or we're coming for you next."

33. Later that day several other deputies arrived wearing black riot gear with masks covering their faces. Roberts watched through a crack in his door as they began pulling each inmate one-by-one out of their cells, first handcuffing them, then beating them, then dragging them out of their cells to the yard where they were subjected to an onslaught of degrading physical and mental abuse.

34. After watching the abuse continue for over an hour, the inmate in the cell directly adjacent to Roberts whispered to him through an air vent, "I'm next, then you." Roberts

responded, "Don't fight back." He then listened to his neighbor's whispers become screams as the deputies charged into his cell, beat him, and removed him to the yard like all the others. They came for Roberts next.

35. The masked deputies dressed in black (the SERT team) kicked at his door. "You're next," they said, and ordered him to back up to the door to be handcuffed. Roberts complied, was cuffed, and taken to the yard. Once outside his cell, Roberts saw more than a dozen officers in riot gear wearing masks. Three of them were on top of his neighbor, who was screaming in pain. As Roberts was walked toward one corner of the concrete yard, one of the deputies began speaking in a low voice into his ear, saying "This is our fucking house. Wait until the camera's off - you'll see."

36. Without warning, unknown members of the SERT team under the direction and supervision of Lt. Merchen and/or Lt. Awad threw Roberts to the ground and smashed his face against the concrete floor. Roberts felt the crushing weight of the deputies on top of him and was unable to breath as the deputies dug their knees into his ribs and back. The deputies bent his wrists backward behind his back, digging the metal of the cuffs into his skin. The deputies told Roberts "This is our fucking house. You guys make our day. We're going to keep fucking you up until you stop."

37. Roberts was then yanked up off the ground by his shackled wrists. Once returned to his cell, one deputy held a Taser at his back and yelled, "Move and we're fucking tazing you!" Another deputy slammed Robert's face into the wall of his cell and held him as another removed his cuffs. Roberts observed a Deputy standing behind him with a shotgun at the ready. The deputies slammed his cell door closed and proceeded to the next inmate. Left alone in his cell, Roberts looked at his bloody wrists. There were cuts on his jaw and on the side of his head, and bruises had already formed all over his back and ribs. He continued to listen to the beatings for at least another hour. He could hear Inmate Brucklacher screaming in pain and being beaten in the cell below him.

38. Roberts repeatedly requested medical attention over the next several hours and days. His requests were consistently met with threats and derision from jail staff. Roberts was told,

SCOTT LAW FIRM
1388 SUTTER STREET, SUITE 715
SAN FRANCISCO, CA 94109

"We'll get to you when we get to you." He was never given medical attention. Roberts could not sleep through the pain for several nights, and he continued to experience severe anxiety attacks that have not abated to this day.

39. Roberts filed an inmate grievance form following the incident. His complaint was determined to be "unfounded and without merit." The response from Sgt. Squires was, "I was a witness during the incident … at no time during the occurrence did staff use excessive force. The actions of the deputies on that day were a response to your defiance and inciting behavior … In the future, I would recommend you take some responsibility for your actions."

40. Roberts was unable to ascertain the precise identities of his assailants during these events due to the fact that their faces were obscured by masks and their nametags removed from their clothing.

## JESSE BRUCKLACHER

41. Jesse Brucklacher, an inmate awaiting disposition for a violation of probation, heard the noise of inmate Montes being extracted by jail staff and rushed to the window of his cell to see what was going on. He observed numerous correctional deputies forcibly taking Montes out of the unit. As Montes was being removed, Sergeant Gallaway, the on-duty supervising sergeant, began shutting the window port covers of each inmates' cell door, eventually closing Brucklacher's as well. On numerous occasions Brucklacher had previously witnessed deputies close window ports immediately prior to the application of physical force to inmates, so that other inmates can't see the violence.

42. Hearing Montes' cries, Brucklacher started kicking his cell door, yelling for the deputies to open the window ports and accusing jail staff of using excessive force. Brucklacher's protests were joined by those of other inmates around him, including Jesus Lopez who was housed immediately next to him. Sgt. Gallaway and Deputies Smith, Peterson, Gordon, and Galante came to Brucklacher's cell, put him in handcuffs, and brought him to the yard, where he saw Lopez lying on the floor face-down with four or five deputies on top of him who were bending Lopez' legs behind his back and calling him a bitch. The guards slammed Brucklacher to

the ground and asked him if he was going to keep yelling or keep his mouth shut. Brucklacher responded that he had freedom of speech. The deputies responded, "Not in here, you don't," and lifted him to his feet and walked him out of the Male Special unit and into the jail's booking area where he was left alone in a holding cell.

43. Later that day Brucklacher noticed members of the SERT team approaching the holding cell. He turned around and placed his hands behind his back. Members of the SERT team entered, including Deputies Medeiros, Williams, Cooper, and Nougier. These deputies aggressively placed Brucklacher in handcuffs and walked him to the booking area's showers, where he was slammed up against a wall and told to remove all of his clothes. While being pressed against the wall, Brucklacher observed red laser dots from the deputies' Tasers moving on his body. Brucklacher did as he was told and removed all of his clothing. He was then told to open his mouth and put his fingers under his tongue to show the deputies he had no contraband. In an act of defiance, Brucklacher did as he was told, but used only his two middle fingers.

44. In response, Deputy Medeiros grabbed Brucklacher by his hair and pulled him forward while kneeing him full-force in the ribs, saying "If you want to fuck around, you're going to get your ass beat." Brucklacher was then thrown to the ground while Deputy Medeiros began punching him and kneeing him, saying, "You don't run nothing but your mouth," and calling him a "pussy little bitch." At no time did the Brucklacher resist or fight back, but instead submissively laid naked on the ground and absorbed the beatings.

45. Next the deputies stood Brucklacher on his feet, reapplied the handcuffs behind his back, and began walking him back to his unit while pulling up on the handcuffs until the steel of the restraints broke through the skin on Brucklacher's wrists. Upon returning to his unit, the deputies threw Brucklacher to the ground facedown, and began folding his legs up behind him, applying tremendous pressure and causing excruciating pain, while continuing to pull on the overtightened handcuffs and kneeing him in the back. While other deputies were on top of the naked inmate, Deputy Medeiros slapped him in the face, called him "Cupcake," and told Brucklacher he better start doing what he was told. Bruchlacker was then taken to another cell and made to lie prone on the ground with his hands cuffed behind his back. Deputy Medeiros and

others began applying excruciating pressure to his wrists for several minutes before dragging him across the jail floor and into a cell where he was uncuffed and left bloodied on the ground.

46. Brucklacher was in such debilitating pain that he could barely lift himself off of the floor. His wrists were bleeding, swollen, and severely discolored, and it was difficult to breathe from the pain in his ribs where Medeiros had kneed him. As he lay on the floor behind his cell door, Brucklacher could hear the deputies assaulting other inmates. He could hear cursing from the guards and screams of pain and crying from the prisoners. He yelled out under his door that the deputies were sick, that they enjoyed hurting people, and that they were no worse than criminals themselves. Medeiros heard his protests and returned to his cell, ordered him to get on his feet, turn around, and cuff up. Brucklacher complied.

47. Medeiros cuffed Brucklacher yet again and removed him to the yard where Medeiros and other deputies began a second, nearly identical round of torture, twisting his legs and wrists, kneeing him in the back, and verbally degrading him. After they were finished, they walked Brucklacher to the Mental Health ward, all the time pulling up on his handcuffs which continued to cut into his already injured wrists. At some points the deputies would walk faster than Bruchlacker was able to carry himself, and each time he would trip or stumble the deputies would slam him face-first to the ground. Despite having no history of mental health issues, Bruchlacker was placed in a "mental health" cell where the floor and walls were splattered with dried feces and urine. He was left there in just his underwear for three days when he was finally examined by jail medical staff and taken back to Male Special. The pain from Brucklacher's physical injuries continued for months, and he has since developed mental health symptoms consistent with post-traumatic stress and anxiety disorder.

48. In response to formal grievances filed by Bruchlacker following these abuses, the Disciplinary and Grievance Officer, Sgt. McMasters, wrote, "The actions of the deputies were merely a response to your immediate defiance and unpredictable behavior as well as your inability to follow simple instructions. …In addition, you have clearly stated in the grievance you acted in defiance during the strip search process. Again, your actions caused our staff to react appropriately. …I suggest you recognize that when you choose to jeopardize the safety of our

- 12 -

staff members with your inciting actions and defiance, our staff is inclined to hold you accountable…"

### RIGOBERTO CABRERA

49.  Rigoberto Cabrera, an inmate serving a sentence for drug possession, was in his cell writing a letter to the mother of his children when he observed through his window port inmate Montes, being dragged out of his cell across the tier and beaten by several correctional deputies.

50.  Several inmates around Cabrera began banging on their doors and yelling in response to the deputies' beating of inmate Montes. Cabrera joined in the protest and began demanding that the deputies stop. The beating of inmate Montes continued, and as the deputies drug him out to the yard, Sgt. Galloway closed the door on Cabrera's window port so the deputies' actions could not be observed by the other inmates. Cabrera who suffers from a documented history of anxiety repeatedly asked for his window to be opened or that he be allowed to go to the Mental Health module. Jail staff refused to acknowledge him.

51.  After some time Lt. Awad came around to Cabrera's cell. Cabrera called out to the lieutenant that the deputies were cowards for treating Montes so violently. Lt. Awad responded cooly, "You're up next'.

52.  Sometime later Cabrera's window port was opened by a member of the SERT team. Deputies dressed in black and wearing masks opened the door and members of the SERT team including including Deputies Medeiros, Cooper, Nouguier, and Williams entered Cabrera's cell. Cabrera was punched directly in the face without provocation or warning. Two deputies grabbed his arms and pulled him to the ground. The deputy on his left arm wrenched it backward at a 90 degree angle causing Cabrera excruciating pain. Cabrera could see another deputy in his cell had a Taser pointed at him. As the pain overtook him, Cabrera screamed "I am not resisting!"

53.  The deputies picked him up and marched him out toward the yard. Just before reaching the doorway, one of the deputies holding his arm told him, "Watch the door," then intentionally shoved him forward causing Cabrera's head to collide with the metal door frame. Once out in the yard deputies slammed Cabrera to the ground causing him to hit the concrete head first. Several deputies surrounded him, many holding zip-ties and one with a shotgun. Deputies

- 13 -

Medeiros, Cooper, Williams, and Nouguier took him to the ground, digging their knees into his rib cage and smashing his face against the concrete. The deputies bent Cabrera's wrists backward and caused the metal of handcuffs to cut into his flesh. His legs were crossed into a 'Figure 4' position and deputies began to apply pressure until Cabrera was in excruciating pain. At that point, a deputy leaned over him and said, "You're my bitch" and that this was "my house." Cabrera responded that the deputies were cowards and what they were doing was wrong. The deputy responded with continued verbal abuse and pressed his finger into a pressure-point behind Cabrera's ear causing him to scream in pain. Throughout the "yard counseling" Cabrera continually screamed out that he wasn't resisting, but the deputies would not desist from their physical abuse. Every outcry from the inmate was met with increased physical force. Deputies wrenched on Cabrera's shoulder even after the inmate cried out that it was going to come out of socket.

54. Cabrera repeatedly called for a camera to film the abuse, realizing that several deputies were standing between him and the Deputy who was holding the video camera. The inmate continued to call out that he had done nothing wrong, and that what the deputies were doing was illegal.

55. After several minutes of verbal taunting and physical abuse, the deputies picked Cabrera up off the ground by his handcuffs and carried him to a different corner of the cement yard where he was placed facedown on the ground. Three deputies got on top him and continued to bend his ankles and wrists into painful positions while pressing their knees into his back.

56. Following this second round of abuse, Cabrera was taken to a new cell. He was left in severe pain, feeling terrorized mentally and physically. His face was almost instantly swollen and bruised.  His right eye was swollen completely shut. His ribs, back and wrists were covered in cuts and bruises.  Cabrera repeatedly asked for medical attention but was not seen by medical staff until days later. While the bruises on his body remained for several weeks, Cabrera continued to experience internal pain for months. His face remains disfigured at the time of this filing, the swelling never having fully subsided on the left side of his face. Following this incident

SCOTT LAW FIRM
1388 SUTTER STREET, SUITE 715
SAN FRANCISCO, CA 94109

his mental health symptoms have become demonstrably exacerbated and he now suffers from symptoms consistent with post-dramatic stress disorder.

57. Following the incident, Cabrera and the rest of the inmates of the unit were kept on "lock down" for several days. He was not allowed to make phone calls and family members trying to visit him were denied. For fifty days following these events, Cabrera was placed on a restricted diet, denied all privileges, and kept isolated in a windowless room with his window port locked closed. Mr. Cabrera filed several grievances, all of which were denied at every level of review.

## STATEMENT OF DAMAGES

58. As a result of the acts and/or omissions alleged herein, plaintiffs suffered general damages including pain, fear, anxiety, and terror and related trauma in an amount according to proof.

59. Plaintiffs sustained serious physical injuries, including permanent injuries, and have also incurred and may continue to incur medical treatment and related expenses in amounts to be determined according to proof.

60. The acts and omissions of the individual defendants were sadistic, wanton, malicious, oppressive and/or done with a conscious or reckless disregard for the rights of plaintiffs. Plaintiffs therefore pray for an award of punitive and exemplary damages against these individual defendants in an amount according to proof.

61. Plaintiffs have retained private counsel to represent them in this matter and is entitled to an award of attorneys' fees and costs.

## CAUSES OF ACTION
## FIRST CAUSE OF ACTION
[42 USC §1983 – FIRST AMENDMENT]

62. All allegations set forth in this Complaint are hereby incorporated by reference.

63. Plaintiffs complained about other inmates being beaten and tortured for no legitimate reason.

64. Such complaints by plaintiffs involve matters of public concern and are protected by the First Amendment to the United States Constitution.

65. Defendants retaliated against plaintiffs for their complaints.

WHEREFORE, plaintiff also prays for relief as set forth herein.

## CAUSES OF ACTION
### SECOND CAUSE OF ACTION
[42 U.S.C. §1983 – FOURTH AMENDMENT - BY PLAINTIFFS ROBERTS AND BRUCKLACHER]

66. Plaintiffs hereby allege and incorporates by reference as though fully set forth herein all prior paragraphs of this Complaint.

67. Defendants violated Plaintiffs Roberts' and Brucklacher's clearly-established right to be free from unreasonable use of force as guaranteed by the Fourth Amendment to the United States Constitution.

68. Defendants acted willfully, wantonly, maliciously, oppressively, and with conscious disregard to the plaintiffs' rights.

WHEREFORE, plaintiffs pray for relief as hereinafter set forth.

### THIRD CAUSE OF ACTION
[42 U.S.C. §1983 – EIGHTH AND FOURTEENTH AMENDMENTS - BY LOPEZ AND CABRERA]

69. Plaintiffs hereby allege and incorporate by reference as though fully set forth herein all prior paragraphs of this Complaint.

70. Defendants violated Plaintiffs Lopez' and Cabrera's clearly-established right to be free from cruel and unusual punishment while being confined as guaranteed by the Eighth and Fourteenth Amendments to the United States Constitution.

71. Defendants' actions described herein were taken for the purpose to harm or to punish the plaintiffs rather than for any other legitimate government purpose.

72. Defendants acted willfully, sadistically, maliciously, oppressively, and with conscious disregard to the plaintiffs' rights.

WHEREFORE, plaintiffs pray for relief as hereinafter set forth.

**FOURTH CAUSE OF ACTION**
[42 U.S.C. §1983 – SUPERVISORY LIABILITY
AGAINST DEFENDANTS AWAD, MERCHEN, HOUSE AND GALLAWAY]

73. Plaintiffs hereby allege and incorporate by reference as though fully set forth herein all prior paragraphs of this Complaint.

74. Defendants Awad, Merchen, House and Gallaway directly supervised, directed and/or participated in the acts and omissions alleged herein. The acts alleged herein were done pursuant to officially sanctioned customs and policies of the Sheriff's Office and the County of Sonoma regarding "yard counseling." Said Defendants acted and failed to act in callous and reckless disregard and indifference to the rights of the Plaintiffs.

75. Defendants Awad, Merchen, House and Gallaway acted willfully, maliciously, oppressively, and with conscious disregard to the plaintiffs' rights.

WHEREFORE, plaintiffs pray for relief as hereinafter set forth.

**FIFTH CAUSE OF ACTION**
[42 U.S.C. §1983 – SUPERVISORY LIABILITY
AGAINST DEFENDANT STEVE FREITAS]

76. Plaintiffs hereby re-allege and incorporates by reference as though fully set forth herein all prior paragraphs of this Complaint.

77. Sheriff Steve Freitas is the final policy maker for the sheriff's Office. The Sheriff's Office is a paramilitary organization with a chain of command. Sheriff Freitas sets policy and is responsible for assuring that sworn personnel within his chain of command are properly trained, supervised and disciplined. Sheriff Freitas has approved and authorized a custom and policy known as "yard counseling." This official policy is also referred to as "behavior counseling."

78. Under this official policy and practice sworn offices within Sheriff Freitas' chain of command are given the authority to arbitrarily and indiscriminately punish and torture inmates who break the rules, or are perceived as being rude or disrespectful to staff. This practice is justified by the desire of some staff to communicate their subjective "goals" and "expectations" to inmates through physical force, threats and torture.

79. Sheriff Freitas approved of this policy and practice, and he has never disciplined anyone in his chain of command for injuries caused as a result of this policy and practice,

including the events alleged in this case. Sheriff Freitas enthusiastically promotes and endorses the policy and practice known "yard counseling." This policy is based on the sadistic, malicious and arbitrary punishment of inmates who are perceived by staff as being rude or disrespectful to them.

80. Defendant Steve Freitas encouraged and condoned the constitutional deprivations alleged herein and showed a reckless or callous indifference to the rights of others.

81. Defendant Freitas acted willfully, wantonly, maliciously, oppressively, and with conscious disregard to the plaintiffs' rights.

82. Defendant Freitas' policy of "yard counseling" was the moving force that caused plaintiffs' injuries.

WHEREFORE, plaintiffs pray for relief as hereinafter set forth.

### SIXTH CAUSE OF ACTION
[42 U.S.C. §1983 – POLICIES AND CUSTOMS AGAINST THE COUNTY OF SONOMA]

83. Plaintiffs hereby re-allege and incorporates by reference as though fully set forth herein all prior paragraphs of this Complaint.

84. As the final policy maker for the County of Sonoma, Sheriff Freitas has instituted and approved an official policy known as "yard counseling." This policy encourages jail staff to punish and torture inmates for arbitrary and subjective reasons. The official "goal" of this policy is to both verbally and non-verbally communicate to inmates that certain offensive behavior will not be tolerated. Instead of writing-up and administering other forms of punishment that are common throughout jails and prisons in the State of California, the County of Sonoma has adopted and implemented a policy that routinely violates the constitutional rights of inmates.

85. The best evidence of this policy is the hundreds of video tapes, and related reports, that document this practice over the past ten plus years. The events alleged in this case are consistent with, and a result of, the official policy of "yard counseling" practiced on a routine basis in Sonoma County jails.

86. The County of Sonoma through its other elected officials, including the District Attorney and the Board of Supervisors, are aware of this policy and approve of it. It is also endorsed and defended by the Office of the County Counsel.

87. Plaintiffs allege that this policy and custom was the moving force that caused plaintiffs' injuries.

WHEREFORE, plaintiffs pray for relief as hereinafter set forth.

## SEVENTH CAUSE OF ACTION
[42 U.S.C. §1983 – DELIBERATE INDIFFERENCE AGAINST THE COUNTY OF SONOMA]

88. Plaintiff hereby re-allege and incorporates by reference as though fully set forth herein all prior paragraphs of this Complaint.

89. The policy and practice of "yard counseling" has been in effect at the Sonoma County jails for over a decade. Hundreds of such incidents have been documented and videotaped by the Sheriff's Office as part of an official administrative review process. As a result, the County of Sonoma was on actual and constructive notice that this policy and practice was unconstitutional and in violation of basic human rights.

90. Depsite knowledge that this policy and practice was causing unnecessary and serious physical and psychological injuries and damages to countless men in the custody and care of the County of Sonoma, the County of Sonoma has turned a blind eye to these abuses and failed to take any steps to stop this practice. As a result of this deliberate indifference the Plaintiffs suffered the injuries and damages alleged herein.

WHEREFORE, plaintiffs pray for relief as hereinafter set forth.

## EIGHTH CAUSE OF ACTION
[42 U.S.C. §1983 – RATIFICATION AGAINST THE COUNTY OF SONOMA]

91. Plaintiffs hereby re-allege and incorporates by reference as though fully set forth herein all prior paragraphs of this Complaint.

92. The acts or omissions alleged herein were ratified by defendant Steve Freitas. He had final policymaking authority for the County of Sonoma concerning the acts of jail staff.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

Sheriff Freitas approved, authorized and ratified the conduct which violated plaintiffs' constitutional rights.

WHEREFORE, plaintiff prays for relief as hereinafter set forth.

### **PRAYER FOR RELIEF**

Plaintiffs pray for relief as follows:

1. For compensatory and economic damages according to proof;
2. For general damages according to proof;
3. For an award of exemplary or punitive damages against the individual defendants;
4. For an award of attorney's fees and costs as permitted by law; and
5. For such other and further relief as the Court may deem necessary and appropriate.

### **JURY TRIAL DEMANDED**

Plaintiffs hereby request a jury trial on all issues so triable.

Dated:  March 30, 2016                                                                      **SCOTT LAW FIRM**

                                                                                            By: /s/ John Houston Scott
                                                                                                John Houston Scott
                                                                                                Attorneys for Plaintiffs